## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

TAMMY LEE RIGGS,

     **Plaintiff,**

**vs.**                                        **CIVIL ACTION NO. 3:16-06641**

CAROLYN W. COLVIN
ACTING COMMISSIONER OF
SOCIAL SECURITY,

     **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION

     This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Standing Order entered July 27, 2016 (Document No. 3.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 14 and 15.)

     The Plaintiff, Tammy Lee Riggs (hereinafter referred to as "Claimant"), filed an application for DIB on February 23, 2012 (protective filing date), alleging disability as of July 1, 2010, due to "rheumatoid arthritis, chronic fatigue, migraines, anxiety, and chronic back pain.[1]

---

[1] On her form Disability Report – Appeal, dated July 12, 2012, Claimant asserted that since her last disability report dated February 23, 2012, she experienced "tire [sic] more easily. More difficult to get around and perform basic functions." Further, Claimant alleged that "[i]t is difficult to sit very long. Hips and legs hurt as well as lower back. Mentally it is difficult to have to depend on others for help completing personal tasks." Finally, Claimant asserted that "[r]ight shoulder pain commended in April of 2012." (Tr. at 283.)

(Tr. at 251.) Claimant's application was denied initially on May 18, 2012 (Tr. at 110-120.) and upon reconsideration on November 7, 2012. (Tr. at 121-127.) Claimant requested a hearing before an Administrative Law Judge (ALJ) which was held on February 11, 2014, before the Honorable Jerry Meade. (Tr. at 56-76.) The record was left open for the submission of additional evidence and for State agency consultant review from a psychological and medical perspective. (Tr. at 73-75.) A supplemental hearing was held on November 20, 2014 (Tr. at 34-55.); Claimant's representative objected to the responses to the medical interrogatories propounded to consultants Charles M. Plotz, M.D. and Stuart Gitlow, M.D. (Tr. at 37-38.) By decision dated February 11, 2015, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 16-33.) The ALJ's decision became the final decision of the Commissioner on June 29, 2016 when the Appeals Council denied Claimant's request for review. (Tr. at 1-10.) On July 25, 2016, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 1.)

Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant

is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. § 404.1520(f). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." 20 C.F.R. § 404.1520a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. § 404.1520a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and

how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 404.1520a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are deemed

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

severe, the SSA compares the medical findings about the severe impairment(s) and the rating and

degree and functional limitation to the criteria of the appropriate listed mental disorder to

determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §

404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s)

which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual

functional capacity. 20 C.F.R. § 404.1520a(d)(3). The Regulation further specifies how the

findings and conclusion reached in applying the technique must be documented at the ALJ and

Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written
> decision must incorporate the pertinent findings and conclusions based on the
> technique. The decision must show the significant history, including examination
> and laboratory findings, and the functional limitations that were considered in
> reaching a conclusion about the severity of the mental impairment(s). The decision
> must include a specific finding as to the degree of limitation in each of the
> functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(4).

   In this particular case, the ALJ determined that Claimant met the insured status

requirements of the Social Security Act through December 31, 2015. (Tr. at 21, Finding No. 1.)

Next, the ALJ found Claimant satisfied the first inquiry because she had not engaged in substantial

gainful activity since the alleged onset date, July 1, 2010. (Id., Finding No. 2.) Under the second

inquiry, the ALJ found that Claimant suffered from the following severe impairments: rheumatoid

arthritis; morbid obesity; urinary incontinence; and degenerative joint disease of the right shoulder;

status post rotator cuff repair. (Id., Finding No. 3.) At the third inquiry, the ALJ concluded that

Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part

404, Subpart P, Appendix 1. (Tr. at 22, Finding No. 4.) The ALJ then found that Claimant had a

residual functional capacity ("RFC") to perform light work as defined in the Regulations:

she can occasionally climb, balance, stoop, kneel, crouch, and crawl. She should avoid concentrated exposure to extreme cold, extreme heat, humidity, and noise. She should avoid even moderate exposure to wetness, vibration, and hazards such as moving machinery and unprotected heights.

(Tr. at 23, Finding No. 5.) At step four, the ALJ found that Claimant was unable to perform past relevant work. (Tr. at 27, Finding No. 6.) At step five of the analysis, the ALJ found Claimant was forty-nine years old as of the alleged onset date, which is defined as a younger individual, and that she subsequently changed age category to closely approaching advanced age. (Id. at Finding No. 7.) The ALJ found that Claimant had at least a high school education, and could communicate in English. (Id. at Finding No. 8.) Employing the Medical-Vocational Rules as a framework, the ALJ determined that Claimant was not disabled, that transferability of job skills was immaterial to the determination of disability, as Claimant's age, education, work experience, and residual functional capacity indicated that there were other jobs existing in significant numbers in the national economy that Claimant could perform. (Id., Finding Nos. 9, 10.) On this basis, benefits were denied. (Tr. at 28, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving

conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

Claimant's Background

Claimant was born on October 15, 1960, and was 54 years old when the ALJ issued his decision. (Tr. at 27.) Claimant dropped out of high school to take care of her grandmother and brother (Tr. at 64.), but she obtained a high school diploma through an at-home course in 2001 or 2002, when she was at least forty years old. (Tr. at 61, 252.) She obtained her license as a certified nursing assistant and she worked in that capacity from 1995 through 2010. (Tr. at 62, 252.)

Issues on Appeal

Claimant has alleged two grounds in support of her appeal: (1) that the ALJ erred in finding her mental impairments were non-severe; and (2) the ALJ did not apply the correct legal standard when evaluating her testimony regarding her limitations and symptoms. (Document No. 14 at 2.)

The Relevant Evidence of Record[3]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Evidence Concerning Mental Impairments:

Claimant has not received ongoing treatment from a mental health professional. However,

---

[3] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

she has received psychotropic medications from Nabil Fahmy, M.D., her primary care physician (Tr. at 543.) Dr. Fahmy has not noted any psychological symptoms but has noted her mental status examinations have been within normal limits. (Tr. at 512, 541, 554, 556, 572, 574, 584, 876, 944, 948, 960, 1023, 1044, 1112, 1116, 1121, 1189, 1200, 1205, 1210, 1215, 1219, 1223, 1231, 1235, 1240, 1242, 1246, 1312, 1331.)

On April 24, 2012, Catherine Van Verth Sayre, M.A. performed a consultative psychological examination of Claimant. (Tr. at 442-444.) On examination, Claimant had depressed mood, moderately impaired recent memory and concentration, and mildly impaired immediate and remote memory. (Tr. at 443-444.) Claimant was observed to have appropriate grooming and hygiene; cooperative attitude/behavior; normal speech; broad affect; normal thought processes; no evidence of perceptual disturbances; good insight; and normal psychomotor behavior, judgment, persistence, pace, and social functioning. (Id.) Ms. Van Verth Sayre diagnosed Claimant with panic disorder without agoraphobia, anxiety disorder not otherwise specified, and major depressive disorder, single episode moderate. (Id.)

On December 19, 2013, Tony Goudy, Ph.D., a licensed psychologist, examined Claimant at the request of her attorney. (Tr. at 1367-1372.) Claimant complained of depression, anxiety, and frequent panic attacks, but acknowledged that she had never received individual psychotherapy or been psychiatrically hospitalized. (Tr. at 1367-1368.) On mental status examination, Dr. Goudy found Claimant had markedly impaired concentration; moderately-to-markedly impaired memory; and moderately impaired judgment; her appearance, interpersonal attitude, speech and communication, perception, orientation, and intellectual functioning were within normal limits. (Tr. at 1370-1371.) Dr. Goudy diagnosed Claimant with major depressive disorder, recurrent,

moderate, generalized anxiety disorder, and panic disorder without agoraphobia. (Tr. at 1371.) He rated Claimant's Global Assessment of Functioning (GAF) score at 55.[4] On a Beck Depression Index – II, Claimant was shown to have severe symptoms of depression, with symptoms of agitation, loss of interest, difficulty making decisions, feelings of worthlessness, concentration problems and decreased libido. (Id.) She also had severe levels of anxiety, based on a Beck Anxiety Index, shown by an inability to relax and fear of the worst happening. (Id.) Dr. Goudy further believed that Claimant would have great difficulty handling the stress of a return to work at this point, and would likely need a year or more of formal mental health treatment to have any hope of successfully pursuing substantial gainful activity at this point. (Tr. at 1372.)

Evidence Concerning Physical Impairments:

On January 30, 2008, at the Holzer Clinic in Gallipolis, Ohio, Claimant underwent an MRI of her brain because of complaints of tingling on the left side of her face. (Tr. at 451.) The MRI showed white matter of the cerebral hemispheres bilaterally, which "may be due to demyelinating disease" or "chronic ischemic changes much more than expected for patient's age." (Id.) On August 7, 2008, Claimant underwent an upper extremity EMG that was abnormal; the impression was mild carpal tunnel syndrome bilaterally, but no radiculopathy. (Tr. at 457.)

Since August 2009, Claimant has been treated by Nabil Fahmy, M.D., her primary care physician at the Holzer Clinic for management of general medical concerns such as mitral valve

---

[4] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 51-60 indicates that the person has "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

prolapse, hyperlipidemia, hypertension, hypothyroidism, migraine, rheumatoid arthritis, gastrointestinal issues, and various musculoskeletal complaints. (Tr. at 494-780, 800-1175.) Claimant's physical examinations have shown some evidence of arthritis, but consistently no edema or cyanosis in her extremities, no inflammatory changes, no joint effusions, minimal to no limitation of movements, and no neurological deficits. (Tr. at 513, 542, 555, 559, 573, 585, 598, 610, 638-639, 647, 658, 708, 731, 736-737, 762, 778, 877, 913, 945, 1024, 1045, 1122-1123, 1202, 1313-1314, 1333.) Claimant has generally denied side effects from her medications, and Dr. Fahmy has routinely indicated that she was doing well concerning her hyperlipidemia, migraine headaches, and rheumatoid arthritis. (Tr. at 514-515, 543, 556, 574, 586-587, 599, 611, 640, 649, 659, 709, 732, 738, 764, 780, 879, 914-915, 948, 1027, 1048, 1124, 1204, 1316, 1334.)

Claimant testified that she had been treated by Dr. Ronald L. Whisler at the Wexner Medical Center at The Ohio State University for her rheumatoid arthritis for approximately eight to nine years (Tr. at 45.), however medical records in evidence show treatment beginning in October 2009. (Tr. at 356-441.)

On June 11, 2010, she reported to Dr. Fahmy that she had pain in her lower left rib cage a few days after she was doing some painting and cleaning at home. (Tr. at 584.) On July 25, 2010, she returned to the Holzer Clinic because she had pulled a muscle in her back helping a friend take a bath. (Tr. at 594.) Claimant was examined by Dr. Fahmy on July 29, 2010 due to her complaints of pain to the right side of the back area: "Says she felt something pop. Also c/o burning, frequency with urine." (Tr. at 597.) On physical examination, Dr. Fahmy noted Claimant had pain in the lower ribs and right flank area. (Tr. at 598.) An x-ray of her thoracic spine was unremarkable. (Tr. at 596.)

By August 9, 2010, Claimant indicated that she was feeling much better, although the pain was not completely gone. (Tr. at 609.) She was hesitant to take her pills because she was afraid of getting used to them. (Id.) Dr. Fahmy indicated, "Since she is [*sic*] still has residual discomfort in her lower back, I asked the patient to use Flector patches, and give [*sic*] her samples." (Tr. at 611.) Claimant testified that Dr. Fahmy advised her that she should not reach or lift anymore because of the pulling of the muscles. (Tr. at 64.)

On November 18, 2010, Dr. Whisler reported to Dr. Fahmy concerning his treatment of Claimant's rheumatoid arthritis and arthralgias. (Tr. at 428-431.) He described her symptoms as moderate, and had been present for the past several months; her joint pain was persistent. (Tr. at 428.) Dr. Whisler reported that she also complained of morning stiffness, that her stamina was fair but she would have liked more energy. (Id.) Treatment notes dated between November 2010 and October 2011 document that Claimant reported no more than mild-to-moderate symptoms with no joint swelling, redness, or heat and no medication side effects. (Tr. at 356-357, 360, 364.) In addition, physical examinations indicated mild synovitis in her joints, with normal range of motion, tonus, stability, and inspection. (Tr. at 357, 361, 365, 378.) By March 29, 2011, Claimant reported to Dr. Whisler that she was not taking any medication for rheumatoid arthritis because "she said she has no problem"; her examination that day was "normal." (Tr. at 674.)

On June 13, 2011, Claimant went to the Holzer Clinic with complaints of dizziness. (Tr. at 701.) She said she had experienced this "for greater than one year" and that "[t]his lasts a few seconds and it feels like a light-headed to almost blackout sensation." (Id.) She reported having one episode in Urgent Care in Meigs where she did apparently black out and was transferred to Holzer Medical Center emergency room, but there was no known cause for it. (Id.) She reported

having very rarely any nausea with it, that it mostly lasted a matter of seconds, although one lasted two minutes. (Id.) Dr. James R. Magnussen ordered an electronystagmography (ENG) and the results indicated that "[a]ll positional tests revealed right beating nystagmus with eyes closed. Left ear warm calorics were attempted three times with no success, therefore caloric analysis could not be completed. Unable to rule out peripheral pathology." (Tr. at 710.)

Based on a bone density test on September 13, 2011, Claimant was diagnosed with osteopenia and had increased risk of fracture at the left hip and the lumbar spine. (Tr. at 478.)

On November 2, 2011, Claimant returned to the Holzer Clinic for a one year recheck concerning her history of chronic interstitial cystitis and back pain. (Tr. at 741.) An earlier April 8, 2011 CT scan of her abdomen and pelvis showed diffuse fatty infiltrate of the liver, gallbladder surgically absent, arterial vascular calcification, phleboliths in the pelvis, degenerative changes of the spine, uterus surgically absent and mild pleural parenchymal scarring identified in the lower lungs. (Tr. at 743.) During this examination, Claimant indicated that she was no longer taking Detrol and instead was taking Elmiron, however she complained of worse back pain. (Id.) It was noted that she had hesitancy and "she is almost having to double void in order to empty. She has no urgency which has improved since the last time she was here." (Id.) Dr. Nicolette N. Jones opined that the urinary problems could be from her back issues and neurological issues, and further noted that Claimant was not sticking to the interstitial cystitis diet. (Tr. at 744.) She was diagnosed with incomplete emptying of the bladder and urinary hesitancy. (Id.)

On January 18, 2012 for a two-to-three month recheck, Claimant reported to Dr. Jones that she was then having morning frequency, but it was just small amounts. (Tr. at 758.) She complained of suprapubic vaginal and vulvar pain that she described felt like she was always

sitting on a hot poker. (Id.) It was noted that Claimant also had dyspareunia, difficult or painful sexual intercourse. (Id.) Dr. Jones noted, "[i]f she strays from her diet she says the bladder pain is a lot worse, especially if she drinks orange juice but she has been drinking coffee. She just stopped a few weeks ago." (Id.) Claimant was taking Savella, a serotonin and norepinephrine reuptake inhibitor (SNRI) for depression. (Id.) She had increased nausea and myalgia. (Id.) Dr. Jones noted, "She says it is harder for her to urinate and she has anorexia and they decreased the dose but . . . she also had constipation." (Id.) It was also reported that Claimant was tearful and crying, asking if there was anything else the clinic could do. (Id.) She also reported severe spasms. (Id.) Dr. Jones provided her B&O suppositories, and if effective, Claimant would be signed up for DMSO (dimethyl sulfoxide). (Id.)

On February 28, 2012, Dr. Whisler saw Claimant concerning joint pain with an additional complaint of right shoulder pain that radiated into her elbow (Tr. at 438, 1177.); she reported experiencing severe symptoms. (Id.) Dr. Whisler found that her rheumatoid arthritis was reasonably controlled, but she had marked tenderness over the right biceps tendon. (Tr. at 440, 1178.) An examination of her joints showed mild synovitis. (Id.) Dr. Whisler administered a right shoulder steroid injection and instructed her to return in three months. (Id.)

Claimant returned to Dr. Whisler in June 2012 with ongoing right shoulder pain. (Tr. at 1299.) Dr. Whisler referred her for a right shoulder MRI, which showed osteoarthritic changes at the acromioclavicular joint and full thickness rotator cuff tear through the anterior aspect of the supraspinatus tendon. (Tr. at 1022.)

The following month, Claimant saw Bruce Haupt, M.D., for evaluation of her right shoulder. (Tr. at 957-959.) On examination, she had tenderness at the lateral acromion, anterior

biceps, and triceps. (Tr. at 959.) She also had mild crepitus in the shoulder and reduced, painful range of motion. (Id.) Dr. Haupt assessed Claimant with right shoulder rotator cuff tear, type 3 acromion, and osteoarthritis at the acromioclavicular joint. (Id.) Dr. Haupt referred her for a course of physical therapy, which provided little relief. (Tr. at 922-930, 934-943, 959.) As Claimant failed conservative treatment, Dr. Haupt referred her for surgical intervention. (Tr. at 916-921, 931-933, 949-956.)

On October 12, 2012, Claimant underwent right shoulder arthroscopic rotator cuff reconstruction, medial open distal clavicle excision, arthroscopic labrum repair, and subacromial decompression and acromioplasty. (Tr. at 909.) She tolerated the procedure well and during a post-operative examination twelve days later she rated her pain as a 4 out of 10 in severity and stated that she was taking nothing more than Tylenol. (Tr. at 893.) Claimant also began a physical therapy program, which she attended through May 2013. (Tr. at 800-875, 885-890, 894-908, 1035-1043, 1050-1066, 1070-1081; 1085-1105, 1125-1127, 1131-1139). Post-operative treatment notes from Dr. Haupt show that Claimant's right shoulder slowly, but gradually improved; in January 2013, she stated that she was "doing good" and Dr. Haupt noted that she had slight improvement. (Tr. at 1142.) In March 2013, Claimant indicated that she had not been diligent in completing her physical therapy exercises, but her range of motion had increased and she was "feeling good". (Tr. at 1105.) In April 2013, she received a steroid injection (Tr. at 1084.), and subsequently had improved range of motion and was noted to be improving, almost back to her normal state, and doing well. (Tr. at 1069.) In May 2013, Claimant reported that she had almost full function of her right arm (Tr. at 1035.) and reported that her pain was 95% improved. (Tr. at 1034.)

With respect to her rheumatoid arthritis, treatment notes from Dr. Whisler dated between

August 2012 and July 2013 document that Claimant was generally doing well. (Tr. at 1293-1299.) At each appointment, Claimant stated that she had only mild symptoms and denied any medication side effects. (Tr. at 1293-1294, 1295, 1297.) In addition, joint examinations showed mild synovitis, but normal range of motion, tonus, and stability in her extremities. (Tr. at 1294, 1297, 1299.) However, a treatment note dated July 10, 2013, indicated that Claimant reported experiencing moderate symptoms from rheumatoid arthritis for the past three months. (Tr. at 1293.) It was noted that she complained of persistent joint pain that was aching in nature and was exacerbated by activity and to some extent diminished with rest or medications. (Id.) Dr. Whisler noted that her stamina was fair to good. (Id.) On examination of her joints, Dr. Whisler again noted mild synovitis. (Tr. at 1294.) He recommended she try gabapentin 300 mg to help with her night pain. (Id.) Dr. Whisler also noted that she had mild pretibial edema, and he believed that dyazide, a diuretic, may be useful and may even help with her stiffness and arthralgias. (Id.)

Non-Examiner Medical Opinions and RFC Assessments:

Dr. Fahmy completed a "To Whom It May Concern" letter dated August 25, 2010, indicating that Claimant was unable to lift patients because she had been diagnosed with chronic back pain. (Tr. at 1357.)

On April 9, 2012, at the initial level, Dominic Gaziano, M.D., a state agency physician, reviewed Claimant's medical records and assessed that she could lift, carry, push, or pull twenty pounds occasionally and ten pounds frequently and sit, stand, or walk about six hours out of an eight-hour day. (Tr. at 84.) Dr. Gaziano further assessed that Claimant could occasionally perform postural maneuvers and she should avoid concentrated exposure to temperature extremes, humidity, and noise, and avoid even moderate exposure to wetness and vibration. (Tr. at 85.)

Finally, Dr. Gaziano noted that Claimant had no manipulative, visual, or communicative limitations. (Id.) On November 7, 2012, upon reconsideration, Dr. Gaziano's opinion was affirmed as written by a second state agency physician, Pedro F. Lo, M.D. (Tr. at 98-100.)

On May 16, 2012, State agency psychologist James A. Brown, Ph.D. concluded that Claimant's psychological impairments were non-severe, and had only mild restrictions in activities of daily living, mild difficulty maintaining concentration, persistence or pace and no difficulty with maintaining social functioning. (Tr. at 82.) Upon reconsideration, on November 5, 2012, Debra Lilly, Ph.D. found that Claimant's psychological impairments were severe, but did not meet or equal a listing; she noted Claimant had difficulty maintaining concentration, persistence or pace was moderate and her difficulty maintaining social functioning was mild. (Tr. at 96.) Dr. Lilly concluded that Claimant's ability to maintain attention and concentration for extended periods and to carry out detailed instructions were moderately limited. (Tr. at 100.) She retained the ability to learn, recall and perform one and two step tasks. (Tr. at 101.)

In June 2012, Claimant underwent a functional capacity evaluation at the Holzer Medical Center. (Tr. at 1359-1365.) Based on this evaluation, Claimant did not qualify for a physical demand classification; however, the therapist described the criteria of sedentary work. (Tr. at 1364-1365.)

On April 23, 2014, at the ALJ's request, Dr. Charles Plotz also examined the medical evidence of record and responded to interrogatories. (Tr. at 1402-1407.) Dr. Plotz concluded that Claimant's physical impairments including morbid obesity, moderate urinary frequency, intermittent joint pain but no arthritis, right shoulder rotator cuff pain status-post surgery, and mitral valve prolapse, but none of these impairments met or equaled a listing. (Tr. at 1402-1403.)

He found no evidence of rheumatoid arthritis. (Id.) Dr. Plotz also opined that Claimant could lift and carry twenty pounds occasionally and she had no limitations sitting, standing, or walking. (Tr. at 1405-1406.) In addition, Dr. Plotz indicated that Claimant could occasionally perform postural maneuvers, except she could never crawl. (Tr. at 1406.) Dr. Plotz concluded that Claimant had no environmental, manipulative, visual, or communicative restrictions. (Tr. at 1407.)

At the request of the ALJ, Dr. Stuart Gitlow reviewed Claimant's medical records and afterwards opined that she had an unspecified mood and anxiety disorder. (Tr. at 1409.) Dr. Gitlow indicated the record did not establish moderate to marked focal impairment present for any longitudinal period of time, and further, "[t]he record indicates that on an ongoing basis for mood and anxiety disorders, the claimant had mild difficulties with social functioning and moderate difficulties with concentration, persistence or pace." (Id.) Dr. Gitlow continued, "[n]o ADL abnormalities and no episodes of decompensation are documented. The claimant neither meets nor equals a listing." (Id.)

In December 2014, Dr. Fahmy completed medical assessment of ability to do work-related activities (physical) indicating that Claimant could only lift and carry less than ten pounds; stand and/or walk less than two hours in an eight-hour workday; and sit less than six hours in an eight-hour workday. (Tr. at 1426-1428.)

The Administrative Hearing

Claimant Testimony:

Claimant testified that she has pain "virtually everywhere" due to her rheumatoid arthritis. (Tr. at 68.) This included pain in her ankles, feet, knees, hips, shoulders, and lower back. (Tr. at 65.) She has pain in her fingers, and mostly her thumb, and the tops of her hands get very sore,

causing her trouble with gripping and holding onto things. (Tr. at 68.) She testified that she has muscle pain as well as muscle spasms. (Id.) Claimant testified that cold weather is a big factor a lot of the time. (Id.) She testified that she takes medicine for rheumatoid arthritis, but stated that it caused significant side effects including nausea, vomiting, weakness, and fatigue. (Tr. at 42-43, 66-67.)

She also testified that she continued to have pain in her right shoulder, despite having rotator cuff surgery, which is also aggravated due to cold weather, and reaching behind her back to fasten garments is difficult. (Tr. at 68-69.) Due to her right shoulder condition, she has pain with lifting, even a gallon of milk causes shoulder pain. (Tr. at 69, 71.)

Claimant testified that she experiences a migraine headache once per month or every six weeks. (Tr. at 43, 67.) Migraines cause her to become nauseated, and that she must avoid light and must rest. (Id.) When she has a migraine headache, she is out of commission for the day. (Tr. at 44.) She has flare-ups of interstitial cystitis depending on what she eats. (Tr. at 70.)

With regard to her anxiety, Claimant testified that she gets "really anxious and things upset me." (Tr. at 71.) She stated that "almost everything" triggers her anxiety, although she admitted that she recently experienced a stressful event when she discovered her brother dead. (Tr. at 72.) This happened "a few weeks ago", but Claimant felt that things went downhill since then and that she's "dealing with it." (Id.)

Vocational Expert ("VE") Anthony Michael Testimony:

During the first hearing, the VE testified that that none of Claimant's skills from her past relevant work, which he noted were classified as medium and semi-skilled, and heavy as the Claimant used to perform the job as a certified nursing assistant would transfer to the sedentary

level. (Tr. at 73.)

During the supplemental hearing, the ALJ asked the VE a hypothetical individual of Claimant's age, education and work experience, able to lift a maximum of twenty pounds, never crawl, occasionally climb, balance, stoop, crouch and kneel, to which the VE responded the individual can perform other unskilled jobs at the light and sedentary levels, such as routing clerk, price markers, inspector, and sorters. (Tr. at 47-48.) A second hypothetical with additional restrictions to light work, must avoid concentrated exposure to extreme cold, extreme heat, humidity and noise, must avoid moderate exposure to wetness, vibration and hazards such as moving machinery and unprotected heights, the VE stated the same jobs would still be available under the first hypothetical. (Tr. at 48.) However, the VE stated that an individual who would miss two to three days of work each month due to medical conditions and having no ability to deal with normal work stress, would be eliminated from all unskilled work. (Id.)

Responding to questions from Claimant's representative, the VE stated that given the first two hypotheticals from the ALJ with the additional restriction that the individual was unable to deal with normal work stress would eliminate those jobs listed. (Tr. at 51.) The VE further stated that if the individual was limited to carry out detailed instructions to the degree that they would be unable to meet competitive standards would allow the sedentary jobs to remain and eliminate the two light jobs, but other light jobs would meet the hypothetical. (Tr. at 51-52.) Finally, the VE stated that if a person were off pace or off task for at least ten percent of the workday, there would be no jobs the person could maintain. (Tr. at 52.)

Claimant's Challenges to the Commissioner's Decision

With regard to her first issue of contention, Claimant argues that the ALJ's finding her

19

depression and anxiety non-severe mental impairments was not based on the evidence. (Document No. 14 at 11-12.) The ALJ gave great weight to Dr. Gitlow's opinion, and rejected Ms. Van Verth Sayre's opinion as well as Dr. Goudy's opinion, however, the ALJ's findings misrepresent Dr. Gitlow's conclusions, specifically where the ALJ found Claimant only had mild difficulties in maintaining concentration, persistence or pace. (Id. at 12-13.) The ALJ provided no explanation for his conclusions, which are not reflected by the opinion evidence, in contravention to Mascio v. Colvin, 780 F.3d 632, 638 (4th Cir. 2015); Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016), quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000); Radford v. Colvin, 734 F.3d 288, 295 (4th Cir. 2013). (Id.) Claimant contends this error was prejudicial, as the VE testified that an individual with moderate limitations in maintaining productivity, concentration and pace would not be able to perform any jobs. (Id. at 14.)

Next, Claimant argues that the ALJ failed to perform the two-step credibility finding required under Craig v. Chater, 76 F.3d 585 (4th Cir. 1996) with respect to her testimony of her joint pain, muscle pain and spasms, migraine headaches and flare ups of interstitial cystitis. (Id. at 14-15.) In short, the ALJ did not consider whether Claimant's impairments could reasonably cause her pain and symptomology, but simply found her not fully credible. (Id. at 15-16.) Claimant moves to have this matter reversed and remanded for proper findings of fact. (Id. at 16.)

In response, the Commissioner argues that the ALJ thoroughly reviewed the evidence related to Claimant's depression and anxiety, which showed that she did not receive treatment by a mental health professional, and that her primary care physician's records indicated she was doing well and her symptoms were controlled with medication. (Document No. 15 at 12.) Further, the ALJ reviewed the consultative evidence from Ms. Van Verth Sayre and Dr. Goudy as well as the

opinion evidence from Dr. Lilly and noted that the evidence of record did not support any of the findings that Claimant had moderate and marked mental limitations. (Id. at 12-13.) Moreover, Dr. Gitlow found Claimant had no more than a mild degree of mental health impairment. (Id. at 13.) Despite Claimant's contention that the ALJ misinterpreted or mischaracterized Dr. Gitlow's opinion, the Commissioner argues that where evidence can support more than one rational interpretation, the Court must defer to the Commissioner's decision. See Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999); see also Alexander v. Shalala, 927 F. Supp. 785, 791 (D.N.J. 1995), aff'd without opinion, 85 F.3d 611 (3d Cir. 1996) ("[W]here evidence of record susceptible to more than one interpretation, the court must endorse the [Commissioner's] conclusion."). (Id. at 13-14.)

The Commissioner adds that Claimant has not shown any functional limitations resulting from her depression and anxiety, and further, she testified that pain and strength were the causes that prevented her from working. (Id. at 14.) The Commissioner also points out that Claimant listed numerous activities in her Function Report that do not indicate she had limitations caused by mental impairments. (Id.)

The Commissioner also argues that the ALJ's finding Claimant's depression and anxiety were non-severe impairments a harmless error, as he continued his analysis of all her impairments, severe and non-severe alike for the remainder of the sequential evaluation. See McKay v. Colvin, No. 3:12–cv-1601, 2013 WL 3282928, at *9 (S.D.W.Va. Jun. 27, 2013); Lewis v. Astrue, 937 F. Supp. 2d 809, 819 (S.D.W.Va. 2013) (applying harmless error standard where ALJ proceeded to step three and considered non-severe impairments in formulating claimant's RFC). (Id. at 14-15.)

Finally, the Commissioner states that the ALJ's two-step credibility analysis was proper,

as Claimant's subjective complaints of pain was inconsistent with the objective medical evidence of record, further, Claimant's allegations of medication side effects were not supported by the medical evidence, thus the ALJ's conclusion that Claimant was not fully credible is supported by the substantial evidence and the decision should be affirmed. (Id. at 15-17.)

In reply, Claimant argues the Commissioner is wrong that Dr. Gitlow found Claimant had a mild degree mental impairment, he found that the record showed she had moderate difficulties in concentration, persistence or pace. (Document No. 16 at 1-2.) Even though the ALJ expressly gave great weight to Dr. Gitlow's opinion, it does not appear that he adopted it, and gave no explanation for the Court's review. (Id. at 2.) Finally, Claimant contends that the ALJ did not follow the two-step credibility determination because he did not explicitly consider the initial threshold question as to whether she had a medically determinable impairment that could reasonably cause the pain and symptoms of which she testified, therefore, this case must be remanded. Bradley v. Barnhart, 463 F. Supp.2d 577, 581-582 (S.D.W.Va. 2006). (Id. at 3.)

Analysis

Psychiatric Opinion Evidence Provided by Stuart Gitlow, M.D., M.P.H.:

Claimant contends that the ALJ erred in his finding her mental impairments were not severe, which was supported by his misstated opinion evidence and minimized the impact of Claimant's psychological impairments on her concentration, persistence and pace. (Document No. 14 at 1.) The ALJ found Claimant's mental impairments, specifically her "affective and anxiety-related disorders" were not severe and further found that she experiences no restrictions of activity of daily living, mild difficulty in maintaining social functioning, mild difficulty in maintaining concentration, persistence or pace and no episodes of deterioration or decompensation. (Tr. at 22.)

22

This conclusion was based on several instances the ALJ noted from the record. First, the ALJ noted that Claimant "has received medicinal treatment for anxiety and depression; however, her physicians have reported no abnormal findings of mental status (Exhibits 4F, 5F, 10F, and 12F).[5] (Id.) The ALJ then considered Ms. Van Verth Sayre's psychological evaluation which revealed Claimant had no abnormal thought process or content, and that her persistence and pace were normal, and memory and concentration were moderately impaired. (Id.) Next, the ALJ considered the evaluation report as well as the mental medical assessment of Claimant's ability to perform work related activities provided by Dr. Goudy, who found mild to moderate limitations of social functioning and marked impairment in concentration, persistence or pace, but ultimately, the ALJ found that Dr. Goudy's findings did "not present a longitudinal picture of the claimant's daily functioning."[6] (Id.)

The ALJ also considered Claimant's ability to care for her personal needs, manage her own money, drive, and perform household tasks, activities reported in both Ms. Van Verth Sayre's report as well as in Holzer Clinic treatment notes. (Id.) The opinions of Drs. Goudy and Lilly were given little weight as the ALJ found them to be inconsistent with the treatment history, as she had been stable on medications for years, and the fact that Claimant had not been referred for mental health treatment or had sought such treatment. (Id.) Finally, the ALJ gave "great weight" to Dr. Gitlow's opinion "because it was based upon a review of the entire record and was based upon the

---

[5] The undersigned notes that these Exhibits include the treatment records from Holzer Clinic, dated 08/17/2009 to 07/19/2012, 05/25/2012 to 12/31/2012, and 09/16/2013 to 12/31/2013, as well as the functional capacity evaluation from Holzer Clinic dated 06/12/2012, respectively.

[6] The ALJ reached the same conclusions regarding the opinion of Dr. Lilly, State agency non-examining consultant. (Tr. at 22.)

objective findings of record." (Id.) The ALJ noted Dr. Gitlow "opined the claimant has no restriction of mental functioning." (Id.)

Due to the arguments surrounding Dr. Gitlow's opinion and the ALJ's interpretation thereof, it is necessary to reproduce Dr. Gitlow's findings provided under the heading "Analysis" in its entirety:

> Although the CE at 13F[7] is afforded significant weight in development of my opinion that the claimant has unspecified mood and anxiety disorders, and although that CE reveals moderate to marked areas of focal impairment, the record does not establish that such impairment is present for any longitudinal period of time. The only other significant mental status exam in the file, at 3F[8], suggests only mild to moderate focal areas of impairment, and all the other medical records indicate stability. Further there have been no referrals to psychiatric or mental health care and no documented interest by the claimant in receiving such treatment in an ongoing manner. This is consistent with a mild degree of mental health impairment and would be unexpected if impairments were genuinely marked on an ongoing basis. The record indicates that on an ongoing basis for mood and anxiety disorders, the claimant has mild difficulties with social function and moderate difficulties with concentration, persistence, and pace. No ADL abnormalities and no episodes of decompensation are documented. The claimant neither meets nor equals a listing. (Tr. at 1409.)

Clearly, Dr. Gitlow provided a synopsis of the relevant evidence of record concerning Claimant's mental health treatment, including the opinions that were procured regarding her mental impairments. The records provided to Dr. Gitlow for his review and analysis indicated Claimant had moderate difficulties in concentration persistence and pace, however, based on his review of the "longitudinal" period; Dr. Gitlow found she had only a "mild degree of mental health impairment" from which Dr. Gitlow opined she neither met or equaled a listing. From the aforementioned "analysis", Dr. Gitlow did not explicitly state that Claimant had "no restriction of mental functioning", because this precise wording is absent from his report to the ALJ.

---

[7] The undersigned notes that this Exhibit is the psychological evaluation report provided by Dr. Goudy.
[8] This Exhibit is the psychological consultative report provided by Ms. Van Verth Sayre.

However, it is clear from the lack of mental health treatment records that caused Dr. Gitlow to conclude Claimant's mental impairment was mild, therefore, the ALJ's conclusion that Dr. Gitlow opined she had no functional restrictions as a result of her mental impairments was not unreasonable or a gross misstatement of Dr. Gitlow's opinion. In that regard, the undersigned further agrees with the Commissioner's argument that despite Dr. Gitlow's finding Claimant had moderate restrictions in concentration, persistence or pace, and that her mental impairments were mild, the ALJ's interpretation thereof deserves deference, as his conclusion is rational; further, the ALJ provided "an accurate and logical bridge from the evidence to his conclusion" thus giving ample explanation in support of his conclusion to allow for meaningful judicial review. Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000); Radford v. Colvin, 734 F.3d 288, 295 (4th Cir. 2013). Finally, due to the overall evidence of record, or lack thereof, as well as the opinion evidence provided, particularly from Dr. Gitlow, the ALJ's ultimate finding that Claimant's mental impairments were not severe was based upon substantial evidence. 20 C.F.R. § 404.1521(a); Owens v. Barnhart, 400 F.Supp.2d 885, 891 (W.D. Va. 2005). Accordingly, the undersigned finds that Claimant's argument on this issue lacks merit.

Compliance with *Craig v. Chater*:

Claimant states that the ALJ did not comply with the two-part test for evaluating Claimant's pain and other subjective symptoms pursuant to Craig v. Chater, 76 F.3d 585 (4th Cir. 1996). (Document No. 14 at 15-16.) At step one, an ALJ must make a threshold determination that the claimant had demonstrated by objective medical evidence that she suffers from a medically determinable impairment which could reasonably be expected to cause the alleged symptoms; at step two, only after a claimant has met her threshold obligation, then the intensity and persistence

of the claimant's pain and the extent to which it impacts the ability to work must be evaluated. Id. at 594-595. Social Security Ruling (SSR) 96-7p[9] clarifies when evaluating symptoms, including pain, 20 C.F.R. § 404.1529 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; the Ruling also explains the factors to be considered in assessing the credibility of the individual's statements about symptoms, as well as the importance of explaining the reasons for the finding about the credibility of the individual's statements. 1996 WL 374186, at *1.

The undersigned notes that the ALJ did not expressly state the two-step process required to assess Claimant's symptoms with the objective medical evidence, or her statements regarding the intensity, persistence and functional limitations of her symptoms prior to finding her not fully credible. The undersigned agrees with Claimant that pursuant to Bradley v. Barnhart, 463 F.Supp.2d 577 (S.D.W.Va. 2006) (J. Copenhaver), the dictates of Craig must be followed, otherwise remand is necessary to determine if Claimant has an objectively identifiable medical impairment that could reasonably cause the pain or symptoms of which she complains. Id. at 582. The Commissioner contends that the ALJ correctly engaged in the two-part credibility analysis by first noting Claimant's subjective complaints and the objective medical evidence of record, then the ALJ provided examples of Claimant's allegations being unsupported by the medical records. (Document No. 15 at 16-17.)

In order to determine if the ALJ committed the reversible error envisioned by Craig and Bradley, a thorough review of the ALJ's credibility analysis is necessary. In his written decision, after the RFC assessment (Tr. at 23, Finding No. 5.), the ALJ stated the following:

---

[9] The undersigned is mindful that this Ruling has been superseded by SSR 16-3p, however, the previous Ruling was in effect at the time of the ALJ's decision, February 11, 2015.

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and SSRs 96-4p and 96-7p. In that regard, the undersigned has given careful consideration to all avenues presented that relate to such matters as:

1. The nature, location, onset, duration, frequency, radiation, and intensity of pain;
2. Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);
3. Type, dosage, effectiveness, and adverse side-effects of any pain medication;
4. Treatment, other than medication, for relief of pain;
5. Functional restrictions; and
6. The claimant's daily activities[10]

(20 C.F.R § 404.1529, and Social Security Ruling 96-7p).

(Tr. at 23.)

What is absent from the ALJ's written decision is the language that normally follows the recitation

of the requirements of 20 C.F.R. § 404.1529 and SSRs 96-4p and 96-7p:

In considering the claimant's symptoms, the [ALJ] must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s) – i.e. an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques – that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the [ALJ] must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the [ALJ] must make a finding on the credibility of the statements based on a consideration of the entire case record.

---

[10] The undersigned notes that the ALJ enumerated all the factors that must be considered with reference to a claimant's symptoms and pain, except for an additional factor listed in SSR 96-7p and 20 C.F.R. § 404.1529(c)(3)(vi): "Any measures you use or have used to relive your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.).

This "boilerplate"[11] language comes from the Fourth Circuit's discussion of the analysis an adjudicator must perform pursuant to Sections 404.1529(b) and 416.929(b):

> Under these regulations, the determination of whether a person is disabled by pain or other symptoms is a *two-step process*. First, there must be objective medical evidence showing 'the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged.'

Craig, 76 F.3d at 594. (emphasis added)

SSR 96-7p directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work. Id. *passim*. In accordance with Section 404.1529(c)(3)(i)-(vii), the Ruling restates seven factors that an ALJ must consider in addition to the objective medical evidence when assessing a claimant's credibility:

1. The individual's daily activities;

---

[11] The Fourth Circuit explored this in Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015) and took issue with the practice of using the boilerplate language: "the claimant's statements concerning the pain, intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functioning capacity assessment" because it impermissibly implied that the RFC was determined before a claimant's credibility. Id. at 639-640.

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g. lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Id., at *3.

In Craig v. Chater, the Fourth Circuit acknowledged that:

[o]n November 14, 1991, the Secretary, acting pursuant to the rulemaking authority delegated by Congress in 42 U.S.C. § 1302, substantially revised the regulations governing the evaluation of pain in SSDI and SSI disability determinations. See 20 C.F.R. §§ 404.1529, 416.929. *These regulations provide the authoritative standard for the evaluation of pain in disability determinations*, see Pope v. Shalala, 998 F.2d 473, 485-86 (7th Cir. 1993), and control all determinations made since their effective date, *including the instant case*. 76 F.3d at 593. (emphasis added)

Pertinent to the case at bar, Section 404.1529(a) states:

In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . However, statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which establish that you have a medical impairment(s) which could reasonably be expected to produce

29

the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled. In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you . . . We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work . . . .

See, also, 76 F.3d at 593-594.

The reversible error found in Craig was that "the ALJ did not expressly consider the threshold question of whether Craig had demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain she alleges. Instead, the ALJ proceeded directly to considering the credibility of her subjective allegations of pain." Id. at 596. In short, the ALJ found that the *pro se* claimant had "severe impairments of the musculoskeletal system", then found her "subjective complaints of pain not credible" and ultimately determined that she had the RFC to perform her past relevant work as a seamstress. Id. at 589.

In this case, after providing the requirements of Section 404.1529, SSRs 96-4p and 96-7p, and the enumerated factors, or "avenues", the ALJ started with a discussion summarizing Claimant's testimony that she stopped working after she sprained the muscles in her side and that "she suffers from pain from all her conditions." (Tr. at 23.) The ALJ then discussed Claimant's complaints of pain and spasms in her fingers, ankles, feet, knees, hips, shoulders, and lower back caused by her rheumatoid arthritis. (Tr. at 23-24.) The ALJ discussed the medication Claimant takes for rheumatoid arthritis and noted her alleged side effects, which included nausea, "sometimes vomiting, weakness, and fatigue." (Tr. at 24.) Because the medication "weakens her

30

immune system", the ALJ noted Claimant's statement that "she was told not to be around patients." (Id.) The ALJ discussed the injections Claimant had received in her knees and shoulders, "which helped for a short time." (Id.) The ALJ mentioned Claimant's monthly migraines, for which she takes Tylenol and "sits in the dark" and is aggravated by noise and lights. (Id.) It was further noted that Claimant had surgery and later therapy for a right torn rotator cuff, which still caused her pain and "movement problems", specifically that "[i]t bothers her to reach behind her back to fasten her garments." (Id.) It was noted that Claimant took medication for her mitral valve prolapse, and that she has palpitations. (Id.) The ALJ acknowledged that Claimant's chronic interstitial cystitis is aggravated "depending upon the food she eats." (Id.) Additionally, the ALJ noted her incontinence and urgency to go to the bathroom. (Id.) Claimant's problems with depression that "has worsened over the last few weeks" was also considered. (Id.) The ALJ mentioned Claimant's statement that she had a pinched nerve in her foot, a condition called Morton's neuroma. (Id.) Due to this problem, the ALJ noted Claimant's complaint that she was unable "to wear a shoe all summer" and relegated to "wearing a boot" for an extended period of time. (Id.) It was noted that Claimant "gets anxious about almost anything" and her physical impairments caused her pain in her right shoulder when she lifts a gallon of milk and cannot hold onto things. (Id.)

The ALJ then launched into a summary of the medical record that documented the treatment Claimant received for her rheumatoid arthritis, right shoulder surgery and subsequent physical therapy, her medications for rheumatoid arthritis, her urinary urgency secondary to interstitial cystitis, and treatment notes concerning these severe impairments. (Tr. at 24-25.) Afterwards, the ALJ found Claimant "is not fully credible" and reconciled her complaints with the objective medical evidence of record. (Tr. at 25-26.)

This case is similar to Bradley v. Barnhart insofar as the ALJ did not "explicitly" make the finding that Claimant proved the underlying medical impairment(s) could have produced the pain and symptoms she alleged. The main difference between the two cases is that the ALJ herein produced a lengthier decision, ten pages versus six pages[12], with more citation to the underlying medical record than in the Bradley matter. The undersigned disagrees with the Commissioner's argument that "although the ALJ found that [Claimant] had an underlying impairment that could produce her alleged symptoms, the medical evidence (and other evidence) did not support the degree and limiting effects of [Claimant's] subjective complaints as she alleged." (Document No. 15 at 16, fn.2.) There simply was no such explicit finding, which makes this case similar to Bradley, resulting in the District Court remanding the matter in order to provide Claimant with a "'fair decision and the reviewing court receives a fairly developed record.'" See, Bradley v. Barnhart, 2:05-cv-00797, Document No. 11 at 10 (quoting Arnold v. Barnhart, 1:04-cv-00422, Sept. 29, 2005 Memorandum Opinion, Docket Sheet Document #18. (C.J. Faber)). As Judge Copenhaver noted in Bradley, though the Commissioner's position is not an "illogical one"[13], insofar as she contends that the ALJ noted that the objective medical evidence of record did not support Claimant's subjective complaints and then properly discounted her credibility[14], Craig mandates that the ALJ make an *explicit* finding of the medically determinable impairment(s) that could have reasonably produced the symptoms and pain of which Claimant complains before proceeding to the credibility analysis.[15] Therefore, in accordance with the jurisprudence in this

---

[12] See, 2:05-cv-00797, Document No. 7 at 13-17.

[13] Bradley, 463 F.Supp.2d at 582.

[14] Document No. 15 at 16-17.

[15] See, also, Basty v. Colvin, 2:13-cv-37-RLV, 2015 WL 5254175, at *8 (W.D.N.C. Sept. 9, 2015); Holloway v. Colvin, 8:12-cv-02664, 2014 WL 1315249, at *17 (D.S.C. March 30, 2014). The undersigned notes that interestingly, in the Holloway matter, the ALJ used the boilerplate language that came under fire in Mascio, however, the decision predates Mascio by one year.

District, the undersigned finds that the ALJ failed to make the required explicit finding that Claimant's medically determinable impairment(s) could have reasonably produced her pain and symptoms, accordingly, the decision is not supported by substantial evidence.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Claimant's Motion for Judgment on the Pleadings (Document No. 14.) to the extent that the ALJ did not comply with the two-step evaluation of Claimant's symptomology required by Craig v. Chater, **DENY** the Defendant's Motion for Judgment on the Pleadings (Document No. 15.), and **REVERSE** the final decision of the Commissioner, and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C § 405(g) for further proceedings as stated *supra*.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.

Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: January 3, 2017.

Omar J. Aboulhosn
United States Magistrate Judge